FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2016 JAN -5 A 8: 56

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| COMPUTER SCIENCES CORPORATION, | § § § |
| Plaintiff, | § § |
| v. | § § 1:16cv008 (LO/IDD) |
| FEDERAL HOME LOAN MORTGAGE CORPORATION D/B/A FREDDIE MAC, | § § § |
| Defendant. | § § |

## COMPLAINT AND JURY DEMAND

Plaintiff Computer Sciences Corporation ("CSC") files this Original Complaint against Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac"), and would respectfully state as follows:

### I. PARTIES

1. Plaintiff CSC is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located at 3170 Fairview Park Drive, Falls Church, Virginia 22042.

2. Defendant Freddie Mac is a federally chartered corporation with its principal place of business located at 8200 Jones Branch Drive, McLean, Virginia 22102. Freddie Mac may be served with process by service upon its Chief Executive Officer, Donald H. Layton, Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, Virginia 22102.

### II. JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Defendant Freddie Mac because Freddie Mac maintains its principal place of business at 8200 Jones Branch Drive, McLean, Virginia 22102.

4. This Court has subject matter jurisdiction over this dispute pursuant to 12 U.S.C. §1452(f) because "all civil actions to which the [Freddie Mac] is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value."

5. Venue is proper in this Court because Defendant Freddie Mac is located in the Eastern District of Virginia and the events at issue occurred, in whole or in part, in the Eastern District of Virginia. Moreover, under the terms of the contract at issue, Freddie Mac has consented to venue in the Eastern District of Virginia.

### III. FACTS COMMON TO ALL CAUSES OF ACTION

#### A. Background Concerning CSC and Freddie Mac

6. CSC is a global provider of information technology ("IT") and professional services and solutions to corporate customers. Since it was founded in 1959, CSC has helped its clients develop and integrate their IT assets in support of operational efficiency, new growth initiatives and other business objectives. CSC's clients include commercial enterprises, as well as state, local and non-U.S. government agencies. CSC has approximately 56,000 employees serving 2,500 clients in more than 70 different countries.

7. Freddie Mac was chartered by Congress in 1970. Freddie Mac participates in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities. Freddie Mac does not lend money directly to homeowners. Freddie Mac has been operating under a conservatorship that began on September 6, 2008, conducting its business under the direction of the Federal Housing Finance Agency ("FHFA").

### B. The Contract Between CSC and Freddie Mac

8. This dispute arises under a contract pursuant to which CSC agreed to provide Freddie Mac with information technology services across Freddie Mac's business operations to unify Freddie Mac's data network and voice services onto a common Cisco platform. CSC also agreed to provide Freddie Mac's business with managed wide area network ("WAN") services, and certain other technology services. The contract required a significant investment by CSC to restructure and improve Freddie Mac's network architecture and operations, and the business deal had an approximate total value in excess of $130,000,000 over the potential life of its term.

9. The terms of the contract were memorialized in a Master Services Agreement dated November 6, 2014 (the "MSA"). The MSA set forth the general terms and conditions that governed the parties' relationship, and the terms concerning the specific services that CSC was to provide were contained in Work Orders entered into under the MSA. Work Order #1 was entered into by CSC and Freddie Mac effective November 6, 2014.

10. Under Section 6.2 of the MSA, CSC's invoices for services rendered were due and payable within thirty (30) days after their receipt by Freddie Mac. In the event that Freddie Mac disputed in good faith any amount invoiced by CSC, Section 6.7 of the MSA required that Freddie Mac: (i) pay CSC all undisputed amounts of the invoice; (ii) use Commercially Reasonable Efforts to provide CSC with an explanation of the dispute on or before the original payment due date; and (iii) deposit the disputed charges into a separate, interest-bearing escrow account pursuant to a mutually agreed upon escrow agreement between the parties and a national banking association selected by Freddie Mac, if disputed charges withheld by Freddie Mac exceeded one (1) month's charges under the contract.

## C. Implementation and Operation of the Services

11. Instead of relying on CSC, and its business partner AT&T, to implement and operate the network services in accordance with the agreed upon service levels, Freddie Mac retained a significant amount of control over critical elements of the implementation and operation of the services. As examples, under Exhibit A-1 to Work Order #1, Freddie Mac retained responsibility for the following functions, among others:

(i) Set policies and standards for the methods, processes and procedures related to in scope services;

(ii) Define requirements for the in-scope services architectures;

(iii) Review and approve strategy for in scope services, including services, data management & technology architecture;

(iv) Review and approve opportunities to improve the Network and Voice architecture, and to reduce costs and streamline processes;

(v) Prioritize and approve recommendations for new technology or automation of tasks related to process design, reengineering and improvement initiatives and efforts;

(vi) Identify and prioritize projects to be planned and executed, and provide input into schedules and cost benefit analysis activities;

(vii) Approve tools/products to improve the delivery of in-scope services;

(viii) Approve policy and standards for data networks including LANs, WLANs, MANs and WANs;

(ix) Approve remote access standards and architecture;

(x) Approve controls and processes for all in-scope services;

(xi) Approve solutions for performance and capacity problems for all in-scope services;

(xii) Approve processes and tools;

(xiii) Approve policy for providing engineering, design, installation and support for LAN/WLAN technologies;

(xiv) Approve policy for enabling or disabling port security on data switch ports;

(xv) Approve all new types of devices for in-scope services

(xvi) Approve all devices prior to being added to the Freddie Mac environment or that would impact the performance of the Freddie Mac environment using defined change control procedures;

(xvii) Approve use of monitoring tools;

(xviii) Approve network design and integration opportunities;

(xix) Approve the policy for dealing with network addressing, including IP addressing and VLAN assignments;

(xx) Approve (i) LAN/WLAN administration solutions, processes, procedures, standards, guidelines and controls; (ii) LAN/WLAN administration and security policy; and (iii) LAN/WLAN designs and plans;

(xxi) Approve policy for providing engineering, design, installation and support for LAN/WLAN technologies;

(xxii) Approve configuration changes;

(xxiii) Approve WAN/MAN optimization plans; and

(xxiv) Approve network capacity requirements.

12. The fact that Freddie Mac retained control over significant aspects of the implementation and operation of the services was not itself a problem. The problem was that Freddie Mac's IT personnel were unwilling, unable or unqualified to effectively perform those functions in a timely manner. Before and during the implementation, Freddie Mac's IT personnel repeatedly delayed providing CSC with business requirements, made changes to the scope of the project, and were chronically indecisive on matters requiring that Freddie Mac make a decision. While Freddie Mac dithered and vacillated over basic decisions, CSC was placed on hold and prevented from moving forward with the implementation. Those delays also caused CSC to incur additional expenses that would have been avoided had Freddie Mac timely performed its responsibilities.

13. When Freddie Mac's IT personnel did make decisions, they occasionally turned out to be bad and costly decisions. For example, Freddie Mac delayed the implementation by insisting that CSC use two technologies (Jabra and Jabber), despite the fact that CSC advised Freddie Mac that the technologies had not gone through sufficient pilots and tests prior to implementation in the production environment. Still worse, Jabber required the use of a new Cisco Release 10 that had not been sufficiently and fully tested. CSC advised Freddie Mac that IP Communicator would provide a more stable and safe solution, but Freddie Mac rejected that advice. Instead, CSC had to wait for problems in the technology insisted upon by Freddie Mac to be corrected.

14. Throughout the implementation, Freddie Mac's IT personnel repeated that they cared more about direction and schedule than quality. The Jabra/Jabber episode proved a prime example of that approach. CSC's recommended use of IP Communicator would have provided a high degree of quality, but Freddie Mac chose Jabra/Jabber and ended up getting low quality.

15. Despite the many hesitations, delays, scope changes and mistakes made by Freddie Mac's IT personnel in attempting to perform their roles, CSC was able to implement the services by March 30, 2015. Since that date, the services have been fully operational and are being performed in accordance with the service levels agreed to by the parties in Work Order #1. Those services have benefitted approximately 8,000 live Freddie Mac users.

D. **Freddie Mac's Breach of the MSA**

16. Despite the fact that Freddie Mac has been receiving the benefit of CSC's services since March 30, 2015, Freddie Mac has failed and refused to pay CSC's invoices for services rendered. Moreover, Freddie Mac has not disputed those invoices in the manner and within the time periods required under the MSA. Furthermore, Freddie Mac has not escrowed the amounts withheld by it as required under the MSA. Instead, Freddie Mac has completely and unequivocally repudiated of all of its obligations under the MSA and Work Order #1.

17. Freddie Mac has periodically requested that CSC perform additional services outside the scope of the original services under written Change Requests. CSC has provided those services to Freddie Mac. Although those services have been provided by CSC, Freddie Mac has not paid nor has it disputed CSC's charges under the Change Requests. Instead, Freddie Mac has completely and unequivocally repudiated its payment obligations for those services.

E. **Freddie Mac's Wrongful Termination of the MSA and Work Order #1**

18. Ironically, after accepting months of service without paying CSC for those services, and after repeatedly failing to perform its own obligations in connection with the implementation and operation of the services, on August 3, 2015, Freddie Mac CIO Robert

Lux purported to terminate the MSA and Work Order #1 for cause. Instead of articulating a genuine reason for the purported termination, Mr. Lux merely stated that "without going into specifics, Freddie Mac's business has been interrupted in significant ways, and we have had to defer other priority projects because our IT resources have been diverted to addressing CSC's performance failures."

19. Mr. Lux's allegations were baseless. In fact, there were only two significant outages prior to his purported termination letter. The first occurred on April 27, 2015 and was caused by Freddie Mac's own ineptitude in improperly configuring the Active Directory managed by Freddie Mac. CSC promptly diagnosed and corrected Freddie Mac's mistake. The second outage occurred over the weekend of July 4th when Freddie Mac's business operations were closed, and was caused by an extensive manhole fire in Philadelphia, which destroyed a circuit used to provide the services. That fire was plainly a *force majeure* event under the MSA. The only reason that a redundant circuit was not in place was that Freddie Mac had required CSC to use an alternative carrier, and Freddie Mac had not executed the requisite authorization for the additional circuits to be put in place. Regardless, there was negligible adverse impact to Freddie Mac's business, as CSC corrected the problem before the open of business the following week. The only outages since his letter have been determined through root cause analyses to be Freddie Mac's responsibility.

20. Since receiving Freddie Mac's purported termination letter, CSC has repeatedly asked that Freddie Mac provide the details of any alleged breach claimed by Mr. Lux. To date, Freddie Mac has failed and refused to provide any basis or substantiation for its conclusory allegation of breach.

## IV. CAUSES OF ACTION

### COUNT I -- Breach of Contract

21. CSC incorporates all of the facts and statements set forth above.

22. The MSA is a valid and legally binding contract between CSC and Freddie Mac. CSC has fully performed its obligations under the MSA and has performed all conditions precedent to commencing this action for breach of contract.

23. Freddie Mac has breached its contractual obligations to CSC by wrongfully failing and refusing to pay CSC amounts validly invoiced to Freddie Mac under the MSA. Freddie Mac has further breached its contractual obligations to CSC by wrongfully failing and refusing to pay the termination charges that are due under the MSA.

24. As a direct and proximate result of the breaches of the MSA by Freddie Mac, CSC has incurred actual damages in excess of $10,000,000, which CSC is entitled to recover from Freddie Mac.

### COUNT II -- Declaratory Judgment

25. CSC incorporates all of the facts and statements set forth above.

26. An actual and justiciable case or controversy exists between CSC and Freddie Mac concerning whether CSC or Freddie Mac have the right to terminate the MSA for cause. As previously stated, CSC has fully performed its obligations under the MSA, and Freddie Mac has materially breached the MSA by failing to pay CSC amounts due thereunder. Accordingly, CSC is entitled to a declaratory judgment that:

(i) CSC has not materially breached the MSA or Work Order #1, and that Freddie Mac's purported termination of the MSA or Work Order #1 for cause is invalid; and

(ii) Freddie Mac has materially breached the MSA and Work Order #1 by failing to pay CSC for amounts due thereunder, and that CSC's termination of the MSA and Work Order #1 for cause is valid.

## COUNT III -- Breach of Duty of Good Faith and Fair Dealing

27. CSC incorporates all of the facts and statements set forth above.

28. Freddie Mac owed a duty of good faith and fair dealing to CSC in connection with the performance of the MSA. Freddie Mac breached its duty of good faith and fair dealing through its actions as alleged herein. Through those actions, Freddie Mac has demonstrated a pattern of completely and willfully ignoring its contractual obligations, accepting services from CSC with no intention of paying for those services, and manufacturing false and unsubstantiated claims of breach as attempted cover for its bad faith motives.

29. As a direct and proximate result of the breach by Freddie Mac of its duty of good faith and fair dealing, CSC has incurred damages in excess of $10,000,000, which CSC is entitled to recover from Freddie Mac.

## COUNT IV -- Gross Negligence/Willful Misconduct

30. CSC incorporates all of the facts and statements set forth above.

31. Freddie Mac's conduct in causing delays and outages, refusing to perform its contract obligations, repudiating its obligation to pay CSC for services rendered, and refusing to provide any explanation for its purported termination for cause is so egregious that it can only be the product of gross negligence and/or willful misconduct on the part of Freddie Mac.

32. Because CSC's losses are related to the gross negligence and/or willful misconduct of Freddie Mac, under Section 21.1(d) of the MSA CSC's claims against Freddie Mac are not subject to any limit of liability. Consequently, CSC is entitled to recover as

damages from Freddie Mac its lost profits under the MSA as well as any incidental, consequential or exemplary damages.

## V. PRAYER FOR RELIEF

WHEREFORE, CSC prays that Freddie Mac be cited to appear and answer herein, and that, upon final hearing, a judgment be entered in CSC's favor awarding CSC:

1. CSC's actual damages established at trial, including CSC lost profits on the contract and any incidental or consequential damages.

2. A judicial declaration that:

   (i) CSC has not materially breached the MSA or Work Order #1, and that Freddie Mac's purported termination of the MSA or Work Order #1 for cause is invalid; and

   (ii) Freddie Mac has materially breached the MSA and Work Order #1 by failing to pay CSC for amounts due thereunder, and that CSC's termination of the MSA and Work Order #1 for cause is valid.

3. CSC's reasonable and necessary attorneys' fees and expenses incurred herein.

4. Exemplary damages.

5. Pre-judgment and post-judgment interest at the highest lawful rate of interest.

6. All costs of Court incurred herein.

7. Such other and further relief, general or special, at law or in equity, to which CSC may be justly entitled.

## VI. DEMAND FOR JURY

CSC hereby demands a trial by jury on all issues so triable.

Date: January 4, 2016   Respectfully submitted,

/s/ David H. Dickieson
David H. Dickieson, Esq.
VA Bar #31768

Schertler & Onorato, LLP
575 7th Street NW
Suite 300, South
Washington, DC 20004
Phone: (202) 628-4199
Facsimile: (202) 628-4177

ATTORNEYS FOR PLAINTIFF
COMPUTER SCIENCES CORPORATION

Of Counsel:

Steve Sumner
Texas Bar No. 19508500
E-Mail: ssumner@sumnerschick.com
David C. Schick
Texas Bar No. 17745700
dschick@sumnerschick.com
David H. Pace
Texas Bar No. 15392950
E-Mail: dpace@sumnerschick.com
Gayle Boone
Texas Bar No. 02628500
E-Mail: gboone@sumnerschick.com
Justin Sumner
Texas Bar No. 24063022
E-Mail: jsumner@sumnerschick.com

Sumner, Schick & Pace, L.L.P.
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
(214) 965-9229