**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

COMPUTER SCIENCES CORPORATION,           )
                                         )
        *Plaintiff,*                     )
                                         )
    v.                                   )        Civil Action No. 1:16-cv-8
                                         )
FEDERAL HOME LOAN MORTGAGE               )
CORPORATION d/b/a FREDDIE MAC,           )
                                         )
        *Defendant.*                     )
                                         )

## Memorandum Opinion

This matter comes before the Court on a Partial Motion for Summary Judgment filed by Defendant Federal Home Loan Mortgage Corporation d/b/a Freddie Mac ("Freddie Mac"). Dkt. No. 167. The Second Amended Complaint in this matter alleges that Freddie Mac breached and wrongfully terminated a contract it had with Plaintiff Computer Sciences Corporation ("CSC"). The Complaint sets forth two causes of action: Count A, Breach of Contract; and Count B, Breach of Duty of Good Faith and Fair Dealing (under New York law). Freddie Mac has counterclaimed alleging three causes of action: Count I, Breach of Contract; Count II, Fraudulent Inducement; Count III, Recission and Restitution. By the present Motion, Freddie Mac seeks judgment in its favor with respect to certain of CSC's claimed damages on the breach of contract claim and judgment in its favor on CSC's claim for breach of the implied covenant of good faith and fair dealing. Freddie Mac also seeks judgment on its counterclaim for breach of contract to the extent necessary to compel CSC to transfer certain equipment to Freddie Mac at terms set forth in the Contract. CSC contends that because Freddie Mac cannot satisfy its burden to show

the absence of a genuine dispute as to any material fact, the Partial Motion for Summary Judgment should be denied in full.

For the reasons outlined below, the Court GRANTS IN PART and DENIES IN PART the Motion.

## I. Background

CSC is an IT service provider. Freddie Mac is a public, government-sponsored enterprise operating in the secondary mortgage market. It is currently operating under the conservatorship of the Federal Housing Finance Agency. On March 31, 2014, Freddie Mac issued a request for proposal seeking to improve its IT services. CSC submitted its initial response on May 19, 2014 and a Best and Final Offer on July 23, 2016. The parties negotiated the agreement over the following three and a half months. On November 6, 2014, CSC and Freddie Mac entered into a Master Services Agreement, under which CSC agreed to provide IT services to Freddie Mac with the goal of unifying Freddie Mac's data network and voice services into a common platform. On November 6, 2014, the parties also entered into Work Order #1, under which CSC agreed to modernize Freddie Mac's voice network, which included replacing Freddie Mac's phones (altogether "the Contract").

Though the Contract is hundreds of pages long, the following features of the contract bear on the present Motion:

- The agreement set forth numerous Milestone achievements, which upon their completion entitled CSC to invoice for the services rendered with respect to that Milestone. Work Order # 1, Ex. A-3, C-2-A, Table II.

2

- Milestone completion was subject to approval by Freddie Mac who could require CSC to revise and resubmit if Freddie Mac identified deficiencies. Work Order #1, Sched. A, § 4.

- Before CSC implemented any changes to the scope of the work under the Contract it was required to obtain a signed Change Order from Freddie Mac. MSA, Attachment 7, § 10.

- CSC was required to invoice Freddie Mac for all amounts due under the Contract within thirty days after the end of the month in which the services were performed. MSA, § 6.1(a).

- Freddie Mac could terminate with or without cause and in either case was obliged to pay Balance Sheet Amounts as defined by the Contract. Termination without cause (for convenience) also obliged Freddie Mac to pay an early termination fee and wind down expenses. MSA, Attachment 9, § 1; Work Order # 1, Sched. C, § 6.1.

- Upon termination, Freddie Mac was entitled to purchase equipment owned by CSC or its subcontractors for the lesser of the corresponding Balance Sheet Amounts and the actual amount capitalized by CSC or its subcontractors for assets or costs incurred, less depreciation. MSA, Attachment 8, §§ 7.1 & 7.2.

By agreement of the parties, the first phase of work performed under Work Order # 1 focused on the transition to CSC of Freddie Mac's voice services. The parties quickly ran into difficulties including a phone outage for Freddie Mac traders on April 1, 2015. That outage occurred, according to a CSC Root Cause Analysis, when "[a] dial peer entry associated to the trader range was removed by human error." The most significant outage occurred from July 4-6,

2015 when a fiber optic cable was cut—through no fault of either party—and the phone system failed to fall back to a working service as intended by the parties. As a result, phone service was mostly disabled through the weekend and partially disabled through Monday, July 6, 2015.

Believing that the July 4-6 outage constituted grounds for termination with cause, the parties stipulated that, by letter dated August 3, 2015, Freddie Mac terminated the Contract, effective February 3, 2016. The effective date of termination was later extended by agreement to December 3, 2016.

CSC filed a Complaint alleging breach of contract and other injuries on January 5, 2016. Dkt. No. 1. Freddie Mac moved to dismiss on March 10, 2016. Dkt. No. 6. CSC filed a First Amended Complaint ("FAC") mooting the motion. Dkt. No. 24. Freddie Mac again moved to dismiss in part the FAC for failure to state a claim. Dkt. No. 29. The Court granted in part and denied in part the Motion. Dkt. No. 40. CSC filed a Second Amended Complaint ("SAC") on June 2, 2016. Dkt. No. 43. Freddie Mac moved to dismiss in part the SAC. Dkt. No. 46. The Motion was denied. Dkt. No. 54. Freddie Mac filed an answer and asserted counterclaims. Discovery ensued and at its close, Freddie Mac filed the present Partial Motion for Summary Judgment. Dkt. No. 167. The matter has been fully briefed by the parties.

## II. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In making a summary judgment determination, the Court must bear in mind that "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Section 22.3 of the MSA provides that "all aspects of the parties' relationship" will be interpreted and construed according to New York law. Applying Virginia's choice of law rules, the Court will honor the choice of law clause contained in the MSA and will apply New York law to its analysis of the contract. "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Hitachi Credit Amer. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)).

Under New York Law, "when parties set down their agreement in a clear, complete document, their writing should...be enforced according to its terms." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004).

### III. Discussion

The present Motion concerns three issues. First, whether CSC can recover as a matter of law on certain of its claimed elements of damages for breach of contract. Second, whether CSC

has stated a claim for breach of the covenant of good faith and fair dealing and gross negligence or willful misconduct. Third, whether Freddie Mac is entitled to summary judgment on its counterclaim for the transfer of certain equipment from CSC at the price to which it believes it is entitled. The memorandum deals with each of these issues in turn.

A. Whether CSC Can Recover Certain of Its Claimed Elements of Damages as a Matter of Law

Freddie Mac contends that CSC is not entitled to obtain damages on many of its claims arising out of the Contract or CSC's performance in support of the Contract. Specifically, Freddie Mac states that as a matter of law, CSC is not entitled to: certain allegedly untimely invoice payments; payments for work not authorized by change orders; the amount of CSC's balance sheet, above a cap of $693,488.07; and early termination fees and wind down expenses. With the exception of three invoices discussed in detail below, the Court agrees that Freddie Mac is not otherwise obligated to pay the disputed invoices. The Court further finds that the balance sheet recovery is capped at $693,488.07 and that CSC is not entitled to early termination fees or wind down expenses.

*1. Invoice Payments*

The parties disagree on whether Freddie Mac is obligated to pay invoices submitted for services rendered by CSC under the Contract. Specifically, Freddie Mac contends that as a matter of law it should not be required to pay invoices 1-4, 34-48, and 53 on the CSC Invoices Exhibit supplied by Freddie Mac. *See* Oakes Decl. 3.

The contract provides that "CSC shall invoice Freddie Mac for all amounts due under this Agreement on a calendar monthly basis within thirty (30) days after the end of the month in which the Services were performed." MSA § 6.1(a). If an invoice is not provided to Freddie Mac by that date, "Freddie Mac will have no obligation to pay for such Services." MSA §

6

6.1(d). However, § 3.2 to Schedule C to Work Order #1 prohibits CSC from invoicing "for the component of the Base Charge prior to CSC's achievement of the applicable Acceptance Criteria for the Payment Milestone related to the Base Charges." If CSC believes it is entitled to payment but is not able to precisely invoice for the amount owed, it is permitted to list the entry on the invoice for the relevant month and subsequently bill for the exact amount when calculable. MSA § 6.1(d). But in no case is Freddie Mac obligated to pay for services invoiced in this manner more than ninety (90) days after the service was provided. *Id.* If Freddie Mac refuses to pay a properly filed invoice which exceeds a certain amount, CSC is entitled to demand that any subsequently disputed amounts be held in escrow until the dispute is resolved. MSA § 6.7.

As noted above, Freddie Mac has provided a list of all invoices it received from CSC with corresponding "reasons for nonpayment" where relevant. *See* Oakes Decl. 3. Of the 54 invoices, 18 are identified as "Base Fees/Consumption"; six are identified as "Transition Milestones"; four are identified as "Change Orders"; five are identified as "Electronic Fax"; two are identified as "1GB Circuit"; and the remaining 19 are identified as "Asset Invoices".

Invoices 1-4 are for "Base Fees/Consumption" for the months of April through July 2015. Base Fees are recurring service charges which CSC is entitled to invoice to Freddie Mac only after the Milestone related to that Base Fee has been approved. Invoices 1-4 relate to the same Milestone—one which was never approved by Freddie Mac. CSC contends that it was nevertheless entitled to invoice for these Base Fees because Freddie Mac's refusal to approve the Milestone was unreasonable or in the alternative because Freddie Mac impliedly approved the Milestone when it conducted a "Go-Live Meeting" wherein the voice services related to the Milestone were activated for use and Freddie Mac employees were trained on the new system.

As Freddie Mac has noted, CSC's position places it into a catch-22; either CSC failed to gain approval for the Milestone in which case it was never authorized to invoice for the base fees or it was somehow impliedly authorized and was therefore obligated under the contract to timely invoice for the services.

All of the invoices were submitted on September 1, 2015. After the commencement of litigation, Freddie Mac paid the majority of Invoices 2-4 (covering the months of May, June, and July 2015) but equitably reduced the payments, as permitted under the Contract, alleging unsatisfactory service. Freddie Mac completely withheld payment on Invoice 1 for service from April 2015. Freddie Mac's records show that the invoices were not paid because the Milestone was not accepted and the invoices were not timely. *See* Oakes Decl. 3. Even if Freddie Mac impliedly approved the Milestone for Invoice 1 or unreasonably withheld approval there is still no factual issue that it was submitted more than ninety days after the services were provided. Therefore Freddie Mac is not obliged to pay that Invoice and is entitled to Summary Judgment on that part of the claim. However, if Invoices 2-4 were impliedly approved or if approval was unreasonably withheld, then CSC was still entitled to belatedly invoice them. Freddie Mac has paid the vast majority of these invoices. Nevertheless, factual issues remain whether (1) Freddie Mac impliedly approved or unreasonably withheld approval of the Milestone associated with Invoices 2-4, and (2) whether and for what amount Freddie Mac was entitled to equitably reduce the payment of these invoices for failure to adequately perform. Summary Judgment is inappropriate at this time on these three invoices.

Invoices 34-48 are all Asset Invoices filed with Freddie Mac on July 5, 2016 for AT&T LAN remediation services. This service corresponds to additional work to upgrade network infrastructure which CSC undertook based on the results of a Network Assessment study that it

commissioned from AT&T. The Contract contemplated that CSC would refresh the infrastructure at a rate of 20% per year over five years. However, based on the Network Assessment, CSC expedited the service and used more robust equipment than contemplated under the Contract. CSC does not point to any evidence that these services applied to a specific Milestone achievement nor is the invoice filed as a Base Fee. Because the Contract requires invoicing within thirty days unless the invoice corresponds to a Base Charge corresponding to a Milestone Payment, CSC's failure to file these asset invoices within thirty days is not excusable under the Contract.

Invoice 53 for the 1GB Circuit is subject to the same invoicing timeline as 34-48. Freddie Mac lists the month(s) of service as August 2015 to October 2016 with an invoice date of November 22, 2016. CSC was required to invoice within thirty days of providing this service. If the service continued over a number of months, CSC was obligated to invoice for each month's services rather than holding all of the charges until after the last month of service. Even if CSC was unable to identify the precise cost of the circuit at the time it began providing services it was still obliged to identify the category of the charges on the invoice for each month and to update with a final amount no later than ninety days. CSC failed to meet this requirement and is therefore not entitled to recover on this invoice.

CSC contends that because its earlier invoices in September 2015 were not promptly paid that the submission of any other timely invoices would be futile. But the parties' course of conduct discredits this assertion. CSC understood that it was permitted to invoice for non-Milestone related services and that Freddie Mac would pay those timely invoices. CSC submitted Electronic Fax invoices as early as May 11, 2015 for service beginning in the month of May 2015. Those invoices were paid in full through August 2015. Oakes Decl. 3.

9

As a result, Freddie Mac is entitled to summary judgment with respect to Invoices 1, 34-48, and 53 but summary judgment is not appropriate with respect to invoices 2-4.

### 2. Payments for Work Not Authorized by a Change Order

The parties disagree on whether Freddie Mac is required to pay for services which were rendered to Freddie Mac but which were not authorized under a Change Order.

Section 3.12(b) of the MSA provides that "CSC will not perform any Functions that CSC believes would constitute New Services without being authorized via a duly executed Change Order." The Contract further provides that if CSC performs services without a Change Order, the work will have been deemed performed at no additional charge. Section 23.9 of the MSA also requires that the [Contract] "may be amended or modified solely in a writing signed by an authorized representative of each party."

New York law "does not permit oral modification when the original written agreement provides that modifications must be in writing and signed." *John St. Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999). "New York will enforce oral modifications in two circumstances-where there has been (1) partial performance or (2) reliance-but only where the subsequent performance or reliance is "unequivocally referable to the modification." *Id.*

Freddie Mac contests three categories of charges for work not authorized by a Change Order. First, CSC seeks $375,995.00 for personnel deployed at Freddie Mac to assist employees of the company when they encountered issues with the phone system. Second, CSC invoiced $871,411.00 for LAN remediation, involving upgrades to Freddie Mac's network so that it could support the voice over internet protocol solution that CSC contracted to implement. The contract expressly contemplated that CSC would upgrade the LAN system at a rate of 20% per year but, as discussed above, CSC accelerated the refresh rate based on a report conducted by its

10

subcontractor, AT&T. Third, CSC submitted sixteen invoices for maintenance of AT&T equipment related to the LAN system on July 5, 2016 and has continued to invoice for the same amount each month since totaling $3,105,082.62. Besides contending that these invoices are untimely (see *supra* III.A.1.) Freddie Mac argues that the work was not authorized by a Change Order. CSC contends that all of the work at issue was authorized by Freddie Mac and that Freddie Mac was aware that it would be responsible for the increased cost obligations.

The parties agree that in some cases Change Orders were executed as contemplated under the Contract. In other cases, Freddie Mac refused to agree to Change Order requests or insisted that requested activities were not subject to Change Orders because they were already contemplated by the project.

With respect to the LAN remediation labor and AT&T equipment, CSC argues that the parties understood that the goals of the Contract would require more robust technology and a faster installation "refresh" rate than originally contemplated. CSC concedes that it was expected to submit a Change Order for the LAN remediation labor and that it did so but that the Change Order was not approved. Nevertheless, CSC provided the labor and services that it believed the parties had agreed to and declined to submit additional Change Orders related to the LAN remediation because it believed that doing so would be an exercise in futility. Nevertheless, CSC contends that the parties' purported oral discussions and intention to re-negotiate the price for the LAN remediation permitted the contract modification and raises a material issue of fact as to whether CSC is entitled to recovery.

CSC points to the declaration of Paul Chisholm of CSC who avers that during a November 2014 meeting on LAN Remediation "Freddie Mac certainly was aware that they were going to have to pay for the infrastructure work to be done" and that "Freddie Mac never

11

represented that Freddie Mac was not going to pay for the infrastructure work to be done." Chisholm Dec. at 4-8. But as Freddie Mac observes, to the extent that these assertions constitute an oral agreement, they stand in contrast to Chisholm's deposition testimony where he stated that "there was no agreement or nonagreement" with respect to the LAN remediation. Chisholm Tr. at 240:9-14, Oakes Decl. Exh. 47. At best, CSC's evidence suggests that the parties had conversations about revising the agreement. But no formal agreement was reached. The fact that the parties communicated about a possible agreement does not justify CSC's assumption that the Contract had been revised and that performance was justified. *See DiStefano v. Maclay*, 102 F. App'x 188, 189-90 (2d. Cir. 2004) ("The fact that parties communicate orally about the status of their affairs with a view toward concluding a contract does not indicate an agreement to perform the contract on any terms other than those stated in the written agreement."); *see also John St.*, 196 F.3d at 382 (finding no oral modification or justifiable reliance where "[t]he allegedly pivotal conversation appellant cites contains some give and take and trails off without a clear resolution.").

Because the Contract expressly prohibited payment for work not authorized by a Change Order and there is no material issue of fact that supports a finding that the parties agreed to modify the Contract, orally or through a Change Order, summary judgment should be granted in favor of Freddie Mac with respect to the work not authorized by a Change Order.

### 3. Balance Sheet Amounts

Whether the Contract is terminated for convenience or for cause, Freddie Mac is required to pay the Balance Sheet Amounts to CSC as a Termination Charge under the Contract, unless the Contract is rescinded because of CSC's fraudulent inducement. Specifically, Freddie Mac contends that the Balance Sheet Amount is capped by contract and that Freddie Mac is not

12

required to pay Transition Costs or the costs for equipment returned to CSC after termination of the contract.

a. Balance Sheet Amounts Cap

The parties dispute the appropriate cap on Balance Sheet Amounts provided for in the Contract and the amount Freddie Mac is required to pay for items on CSC's balance sheet.

Section 2(c) of Attachment 9 to the MSA defines "Balance Sheet Amounts" as the "lesser of (i) the amount shown on the relevant exhibit to Schedule C of the terminated Work Order and (ii) the actual amount capitalized by CSC (or CSC's approved subcontractors) with respect to the asset or cost incurred….less in either case all accumulated depreciation or amortization through the date when the termination is to be effective…". Exhibit C-5 to Work Order # 1 provides the Balance Sheet Amounts which vary based on the month of termination. The parties disagree on whether the Month 23 or Month 25 caps should be used. A record of the Balance Sheet Amounts under both months is reproduced below.

| Balance Sheet Amounts | Month 23 | Month 25 |
|---|---|---|
| Voice Service | 2,760,557.12 | 2,618,245.17 |
| Data Network Services | 2,609,188.11 | 2,690,024.26 |
| Network Security | 1,627,521.50 | 1,624,540.76 |
| Video and Web Conferencing | 106,712.85 | 116,570.85 |
| Mobile Communications | - | - |
| Electronic Fax | 21,887.22 | 20,819.04 |
| Account Management/Overhead/PMO | - | - |
| Total Balance Sheet Amounts | 7,125,866.80 | 7,070,200.08 |

Freddie Mac contends that the extent of its Balance Sheet Amount liability is $629,610.00[1] for "headsets and hockey pucks"—equipment deployed by CSC to support the services which Freddie Mac has retained for its post-termination use. CSC argues that the Balance Sheet Amounts Freddie Mac owes with respect to this equipment is actually

---

[1] In the Partial Motion for Summary Judgment, Freddie Mac avers that amount for headsets and other voice equipment is $693,488.07. CSC notes in its opposition that the net book value for the assets as of December 2016 was $629,610.00 and Freddie Mac accepts this figure in its reply briefing.

13

$962,965.95, the original cost to CSC for the assets, rather than the depreciated value quoted by Freddie Mac. There is no issue of fact that could entitle CSC to recovery of the original value of these assets because the Contract expressly prohibits CSC from recovering for the value of depreciation of assets on its balance sheet. *See* § 2(c) of Attachment 9 to the MSA.

CSC also contends that it is entitled to all additional amounts on its balance sheet for "assets and costs", totaling $6,055,041.78 (including the equipment) because that figure is less than the "Total Balance Sheet Amounts" (whether in Month 25 or 23). Freddie Mac argues that the Court should only look to the specific itemized entries and apply caps with respect to the type of service rendered. Under this view, CSC's Balance Sheet Amounts are subject to caps for Voice Service and Data Network Services because CSC listed only the Balance Sheet Amounts for Voice Services and Data Network Services in amounts it seeks to recover in this action. *See* Oakes Decl. Ex. 4. The parties agree that despite contemplating the other categories of services, none were actually deployed by CSC. Nevertheless, CSC contends that "nothing in the contract limits CSC's Balance Sheet Amount to the services FM allowed CSC to provide." Dkt. No. 200, at 23.

The parties have waged a grammatical argument on whether the use of the phrase Balance Sheet Amount (singular) in some portions of the Contract is a reference to the Total Balance Sheet Amounts (plural) in C-5 (CSC's view) or the itemized Balance Sheet Amounts in the table (Freddie Mac's view). The arguments on both sides are flimsy because the parties have provided no citations to the Contract from which the Court could reach a definitive conclusion about the plural/singular distinction. But this argument is largely academic. As discussed below, the other Balance Sheet Amounts that CSC claims are not properly attributable to the Balance Sheet and should not be charged to Freddie Mac. Once these costs are excluded from

14

the Balance Sheet Amounts, the only remaining amount is the cost (less depreciation) for the voice services equipment ("headsets and hockey pucks") retained by Freddie Mac. Because the parties do not dispute this figure, summary judgment is appropriate on this issue.

### b. Transition Costs

CSC argues that of the $6,055,941.78 total on CSC's Balance Sheet, it is entitled to $4,288,280.90 represents the total net book value of transition costs associated with the network modernization project. The transition costs include labor and travel costs incurred by CSC on Freddie Mac's behalf.[2]

Freddie Mac contends that the Contract expressly provided for the payment of labor and travel costs through Milestone Payments and prohibits CSC from billing these costs in any other manner. Schedule C to Work Order # 1 § 2.1 provides that "Transition Charges enumerated in Table II. Payment Milestones for Transition Services of Exhibit C-2-A (Network Services Pricing) shall fully compensate CSC for performance of all activities required to complete the Transition…" Section 5.3 of the MSA provides that "expenses that CSC incurs in performing the Services (including travel and lodging…) are included in CSC's charges and rates provided in this Agreement. Accordingly, such expenses are not separately reimbursable by Freddie Mac unless, on a case-by-case basis for unusual expenses, Freddie Mac has agreed in advance and in writing to reimburse CSC for the expense." Taken together, these two provisions provide that payments for transition services, including travel, are reimbursement entirely through Payment Milestones and that they may not be separately reimbursed unless Freddie Mac agrees to the arrangement in advance. By attaching the travel costs to the Balance Sheet Amounts, CSC attempts to recover for its travel costs when it failed to comply with the terms of the agreement

---

[2] Confusingly CSC amortizes the amounts for travel despite arguing that depreciation is inappropriate with respect to the equipment charges discussed in III.A.3.a.

for these expenses. CSC's reliance on the broad language in § 2(c) of Attachment 9 to the MSA which states that Balance Sheet Amounts apply "with respect to the asset or cost incurred" does not offend the very specific guidance provided in Schedule C and Section 5.3 discussed above. It may be that certain costs may be applied to the Balance Sheet Amounts but the Contract excludes the application of travel costs. For this reason, Freddie Mac is entitled to Summary Judgment on the claim for Transition Costs.

c. Redeployable Equipment Returned to CSC

CSC seeks recovery for $460,965.02 for assets including Cisco switches and gear that CSC purchased to deploy the "UCaaS platform" for Freddie Mac. The parties agree that the assets have been returned to CSC and that CSC can redeploy the assets for other projects. Nevertheless, CSC seeks the payment "to account for depreciation." Because Freddie Mac has not paid CSC's service invoices in full, CSC does not believe it has recouped the value of the depreciation.

Freddie Mac objects to this request for damages because it was not timely filed. But whether or not the claim is in procedural default it is substantively infirm.

As discussed above, the Contract expressly prohibits CSC from recovering for the depreciation of assets. Furthermore, CSC's corporate representative stated in his deposition that CSC would not be entitled to payment for equipment which was returned to the company. Moran Dep. Oakes Decl. 42 at 104:5-105:12. Accordingly, CSC should not be entitled to recover the value or the depreciation value of the redeployable assets.

16

### *4. Early Termination Fees and Wind Down Expenses*

Freddie Mac argues that it is not required to pay early termination fees or wind down expenses contemplated by the MSA because the Contract was terminated for cause, rather than convenience, and because CSC improperly calculated and invoiced the wind down expenses.

The parties agree that if Freddie Mac terminates the Contract for convenience then it is obligated to pay to CSC an early termination fee and wind down expenses in addition to the Balance Sheet Amounts.  MSA, Attachment 9, § 1; Work Order # 1, Sched. C, § 6.1.

Freddie Mac contends that termination for cause was justified by the service outage which occurred from July 4-6, 2015.  The parties do not dispute that the service interruption occurred at a Critical Location and that the outage lasted longer than 60 minutes, as required for "for cause" termination under the contract.  CSC contends that the outage does not justify "for cause" termination because the incident was caused by Freddie Mac's failure to properly configure DNS tables which would have enabled the CSC-designed fail-safes to work as intended and preserve service.  Section 12.3 of the MSA excuses CSC's nonperformance of its obligations to the extent that the nonperformance results from Freddie Mac's failure to perform and CSC provides Freddie Mac timely notice of its failure to perform.

Despite CSC's contention in its briefing that the DNS configuration caused the failure of the fail-safes; CSC's official report and internal emails reveal the level of CSC's culpability for the outage.  CSC's own report on the incident notes that the accident was caused by a fire in Philadelphia Electric facilities which damaged a fiber optic cable responsible for the phone services but that "CSC's monitoring was inadequate to detect the outage", "a fail over back up circuit was not in place so connectivity between Freddie Mac and [the host system] was lost", and "configuration and architectural flaws in CSC's UCaaS solution precluded a complete fail

17

over by means other than a circuit." Oakes Decl. 27. One of CSC's executive vice presidents, Steve Hilton, in an email to other CSC team members confirmed that "[t]he fundamental issue (in addition to break down in incident management) is that the service we implemented did not have a working failover/DR solution" and opined that Freddie Mac might use this incident as a basis for termination for cause. Oakes Decl. 28. In another internal email between CSC employees, Steve Hilton commented to Mike Lawrie on July 5, 2015 at 6:47 PM EST that the issue was "[s]till not fully resolved" and that "UCaaS is just not ready for prime time and I think poorly conceived" concluding that the situation was "[o]verall a very embarrassing showing." Oakes Decl. 29. In an email one week after the outage Hilton apologized to David McGee at Freddie Mac stating that "its [sic] just unacceptable to me that we went live without working resiliency / Disaster Recovery solution, and when it did not work we clearly did not have the right incident process or skills [sic] sets available to resolve quickly—it was embarrassing." Oakes Dec. 32.

In the face of this considerable evidence that CSC was responsible for failing to adequately monitor the service breakdown or to transition to fail safe services, CSC musters no citations to the record in support of its claim that Freddie Mac's mishandling of DNS servers caused the breakdown. The extent of CSC "evidence" is a footnote to its own opposition to summary judgment which states that "[p]roper DNS configurations would have provided a pathway for the soft phones to fail over to the Chicago Data Center ("CDC"), following the loss of connection at the Newark Data Center ("NDC")." Dkt. No. 200 at 26. Such a self-serving statement, even if true, is unsupported by the record upon which the Motion must be decided. Furthermore CSC presents no evidence that it promptly notified Freddie Mac that it held Freddie Mac responsible for the outage.

Based on the lack of evidence that CSC has mustered to rebut the statements of its own employees that the company was responsible for the outage, summary judgment is appropriate on the issue of whether termination was "for cause". Because Freddie Mac terminated for cause, any complaint as to wind down expenses or termination fees is moot.

### 5. Lost Profits (Based on Gross Negligence, Willful Misconduct, or Fraud)

CSC seeks recovery for lost profits because of Freddie Mac's termination of the Contract. Pursuant to the MSA, CSC is not permitted to seek lost profits as damages unless it can show that Freddie Mac engaged in gross negligence, willful misconduct, or fraud. MSA § 21.1(d). Freddie Mac argues that it is not required to pay lost profits because CSC has set forth no evidence to support its allegations of gross negligence, willful misconduct, or fraud, and that even if it has, CSC has failed to provide evidence of lost profits on which its recovery is based.

The Court has considered this issue before. CSC's First Amended Complaint stated an independent cause of action for gross negligence, willful misconduct, and fraud. *See* Dkt. No. 24 at 10-11. The Court dismissed that claim and instructed CSC to refile an amended claim. *See* Dkt. Nos. 39, 40. In the Second Amended Complaint, CSC does not set out gross negligence, willful misconduct, or fraud as a separate cause of action. Rather, CSC claims that the breach of contract alleged in Count A "is so egregious that it can only be the product of gross negligence, willful misconduct, or intentional fraud…[c]onsequently, CSC is entitled to recover as damages from Freddie Mac its lost profits under the MSA as well as any incidental or consequential damages." Dkt. No. 43 at 12.

Under New York Law, a plaintiff must establish four elements to assert gross negligence or willful misconduct: "(1) the existence of a duty; (2) a breach of that duty; (3) injury as a result thereof; and (4) conduct that evidences a reckless disregard for the rights of others or 'smacks' of

intentional wrongdoing." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 2013 WL 1294519, at *15 (S.D.N.Y. Mar. 30, 2013), *aff'd*, 552 F. App'x 13 (2d Cir. 2014). But, "the duty giving rise to a gross negligence claim must be independent of the duty arising from a contract. That is, a party cannot sustain a tort claim if it does no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached." *Purchase Partners, LLC v. Carver Federal Sav. Bank*, 2012 WL 6641633, at *13 (S.D.N.Y. Dec.13, 2012) (quotations omitted).

The extent of CSC's "evidence of FM's Gross Negligence and Willful Misconduct" is a summary paragraph of evidence which CSC believes will be presented at trial. The list in its entirety is: "[t]he evidence at trial will include descriptions of FM's failure to pay any amounts until after the filing of this lawsuit, FM's attempt to retain control of the network and system, FM's attempts to gain assets and services without payment, and other acts referenced in this document and its exhibits." Dkt. No. 200 at 33.

None of these summary assertions or the supporting documents and exhibits "smack of intentional wrongdoing." What they reveal is considerable disagreement between the parties about the rights and obligations imposed by the Contract (e.g., to withhold or refuse payment, to make decisions about network and system operations, and which services and assets are covered by the contract—and at what price). But all of these issues are discussed at length with respect to the breach of contract claim and New York law does not permit a plaintiff to maintain a gross negligence claim which is duplicative of claims arising out of perceived contract violations. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir.2012) (holding that gross negligence claim must be dismissed as duplicative of a breach of contract claim "unless a legal duty independent of the contract itself has been violated"). There

20

is no issue of material fact supporting a finding of gross negligence or willful misconduct independent of the contractual dispute. Accordingly Plaintiff cannot seek lost profits and the Court need not consider whether Plaintiff has adequately presented factual evidence of lost profits.

### B. CSC's Claims for Breach of Covenant of Good Faith and Fair Dealing

Freddie Mac has moved for summary judgment on CSC's claim for Breach of the Covenant of Good Faith and Fair Dealing arguing that it is duplicative of CSC's breach of contract claim. Because CSC has failed to set forth a factual issue showing the breach of an independent duty of good faith and fair dealing summary judgment is appropriate on this claim.

"Under New York law, there is a covenant of good faith and fair dealing implied in all contracts." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 298 (S.D.N.Y. 2012). However, breach of that duty is almost always treated as breach of the underlying contract and therefore duplicative of a breach of contract claim. *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002); *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."). A claim of breach of this implied covenant will be considered duplicative of a breach of contract claim unless it is "premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y. 2008); *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243–44 (S.D.N.Y.1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."). Further, "[f]or a complaint to state a cause of

21

action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128, 130 (1999).

This claim was also argued in the parties' earlier motion practice. On the Second Motion to Dismiss, the Court ruled that CSC had stated a claim for breach of good faith and fair dealing under New York law. Dkt. No. 54. Relying on this, CSC contends that the Court should deny summary judgment because Freddie Mac "simply re-urges the same arguments it raised in both of its Motions to Dismiss as to CSC's claim for the breach of the covenant of good fait [sic] and fair dealing. The Court Denied FM's Motion to Dismiss." Dkt. No. 200 at 23 (citations omitted). The Court summarily denied Freddie Mac's Second Motion to Dismiss the good faith and fair dealing claim. *See* Dkt. No. 54.

CSC is correct that Freddie Mac's present argument is the same one raised at the motion to dismiss stage. In addition, Freddie Mac argues that CSC's answers to interrogatories confirm that the factual bases underlying the good faith and fair dealing claim are identical to the breach of contract claim. Interrogatory 6 requested any factual basis for breach of contract due to gross negligence, willful misconduct, or fraud allegations. Similarly, Interrogatory 13 requested any factual basis with respect to the good faith and fair dealing claim. CSC's answers are nearly word-for-word identical. *See* Oakes Decl. 45 at 3-11. The only material difference between the answers is that Interrogatory 13 concludes with the statement that "[t]his conduct, and others, prevented CSC from providing the full measure of services contemplated by the MSA. In addition, the MSA, as well as the parties contemplated that there would be additional Work

22

Orders beyond Work Order #1 to provide for enhanced services related to voice services, including the implementation of an enhanced "e-911" service. *Id.* at 11.

CSC contends that the factual record establishes a genuine issue of material fact with respect to the breach of good faith and fair dealing. CSC alleges that the evidence shows that Freddie Mac's misconduct caused delays and contributed to service outages, that Freddie Mac refused to pay for assets provided and services rendered, and that Freddie Mac set out to "frame" CSC in order to generate a basis for termination with cause. However, the facts CSC identifies do not present a factual issue of breach of the covenant of good faith and fair dealing. Rather the claims are duplicative of the breach of contract or mere conclusory allegations.

CSC alleges that Freddie Mac repeatedly caused delays by refusing to approve Contract Milestones. The MSA permits Freddie Mac to review whether CSC has met Milestones and to require CSC to revise its submissions if they do not meet Freddie Mac's approval. *See* MSA § 4.1. Accordingly, the contract contemplated delays between CSC's submission of a Milestone for approval and Freddie Mac's approval. Even if Freddie Mac's delays were improperly long or unfounded, its unjustified failure to approve the Milestones is a breach of the contract. CSC seeks to supplement this inadequacy by positing that "the consistent delays indicate that there *may have been* a calculated plan by FM [Freddie Mac] to delay approvals of Milestones in order to delay invoicing by CSC, which in turn would delay any payment by FM." Dkt. No 200 at 29 (emphasis added). CSC also claims that "FM approved and accepted a multitude of assets and services…[y]et, the evidence reveals that FM *may never have* had an intention of ever paying." *Id.* at 30. The conjectural nature of these claims is self-evident and in any case, the evidence mustered in support, that Freddie Mac refused to pay for LAN mediation, transition costs, and

23

balance sheet amounts, is the substance of the same claims raised in Count A for Breach of Contract.

CSC also claims that the evidence shows that Freddie Mac "has not: trained its people appropriately, configured circuits accurately, or provided information timely." *Id.* at 29. But CSC offers no facts in support of these claims.

Finally, CSC argues that Freddie Mac set out to frame CSC in order to identify a basis for termination with cause. Such an extreme accusation, if true, may constitute bad faith. As with the other claims in this Count, CSC fails to muster evidence in support. CSC points to an email from Freddie Mac's CIO, Robert Lux, in late May to James Magee which CSC quotes in their brief as: "My obvious choice is to pay [CSC] nothing for implementation…" Dkt. No. 200 at 31; Boone Decl. 26. He further instructs that Freddie Mac should "determine what legal rights we have and whether the SLA's are written in a way to support this position." *Id.* Omitted from CSC's quotation is the statement between the two quoted passages where Mr. Lux states that his preference is to pay them nothing "till [sic] they fix our issues." Boone Decl. 26. Earlier in the day and on the same email chain Mr. Lux advised Larry Coutry and others that he desired "to dispute the payment in that I don't think CSC provided a reasonable level of service in terms of the implementation or ongoing service." *Id.* Rather than supporting CSC's conclusion that Freddie Mac was fabricating reasons for terminating with cause, the complete email chain suggests that even in May 2015, Freddie Mac already felt that the CSC service was inadequate and unreasonable. As a result, CSC's "gotcha moment", a June 2015 memorandum where Mr. Lux notes that "To-date have not paid CSC anything for voice service and they can't backbill us for services" and that Freddie Mac is unlikely to proceed to Phase 2 with CSC, offers no surprises. *See* Boone Decl. 27. Mr. Lux had already discussed with his team a month earlier that

24

services were inadequate and elected to withhold payment because he perceived that CSC had breached the Contract. The evidence put forward by CSC confirms the conclusion that Freddie Mac documented perceived service issues long before the July 4, 2015 incident which prompted termination. Even if CSC disagrees with Mr. Lux's opinion as to whether the services were adequate and whether Freddie Mac was entitled to withhold payment because of a perceived breach, these are questions of contract not questions of good faith.

Discovery in this matter is closed. At this juncture, CSC is required to do more than plead conjecture; it must present facts showing that the delays and refusals of payment were in fact an intentional scheme to frustrate the contract—which it has not done. Accordingly, Freddie Mac is entitled to summary judgment on Count B.

C. Freddie Mac's Counterclaim – Transfer of Eligible Equipment for Balance Sheet Amounts

Freddie Mac has counterclaimed that it is entitled to the transfer of "Eligible Equipment", specifically certain equipment owned by AT&T, subcontractor to CSC, as contemplated by the Contract. CSC agrees that Freddie Mac is entitled to the transfer but the parties disagree on the amount that Freddie Mac is required to pay for the Eligible Equipment. Freddie Mac argues that it is only obligated to pay the lesser of (i) the corresponding Balance Sheet Amounts listed on Exhibit C-5 to Work Order No. 1 and (ii) the actual amount capitalized by CSC or its subcontractors for assets or costs incurred less depreciation. CSC contends that it only rents the assets from AT&T and that, in order for Freddie Mac to buy the assets, CSC must first pay AT&T for the total capitalized value of the assets, $3.7 million dollars, which will in turn be reflected on CSC's balance sheet and subject to payment in that amount by Freddie Mac. Freddie Mac concedes for the sake of argument that the capitalized value of the assets exceeds the Balance Sheet Amounts. Pursuant to the Contract, Freddie Mac contends that it cannot be

required to pay more than the $2.69 million cap for the "Data Network Services" portion of the Balance Sheet Amounts.[3]

Whether or not CSC as of yet owns the AT&T assets, it is obligated to allow Freddie Mac to purchase the assets and the amount that it can require Freddie Mac to pay for those assets is controlled by the Contract. CSC has not argued that the appropriate cap by which the AT&T purchase should be measured is the total for all Balance Sheet Amounts of over $7 million dollars. The AT&T assets are Cisco Routers and Switches which facilitate internet connectivity. *See* Oakes Decl. 40 at 4-7. There is no fact issue that these materials were purchased in support of Freddie Mac's "Data Network Services". *See* Oakes Decl. 41 (August 24, 2016 Email from James McGeechan of CSC to Howard Lindenberg of Freddie Mac stating that "Freddie Mac's *network* was found to put the deployment of voice services at risk. To mitigate this risk, CSC arranged for the installation of the AT&T equipment.") (emphasis added). There is also no question of fact that Freddie Mac is entitled to purchase the equipment for no more than the Data Network Services Balance Sheet Amount contemplated by the Contract. Accordingly, Freddie Mac is entitled to summary judgment on this counterclaim.

### IV. Conclusion

For the reasons discussed above, the Court GRANTS IN PART and DENIES IN PART the Motion. Dkt. No. 167. Specifically, the Motion is granted in full except as to Defendant's duty to compensate Plaintiff for Invoices 2-4 on Defendant's invoice form.

January 23 2017
Alexandria, VA

/s/
Liam O'Grady
United States District Judge

---

[3] As discussed above, the parties dispute whether the appropriate Balance Sheet Amounts apply from Month 23 or Month 25. In this case the difference is less than $100,000 and the use of Freddie Mac's preferred Month 25 figures results in a higher payment to CSC.