**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1398

COMPUTER SCIENCES CORPORATION,

       Plaintiff - Appellant,

  v.

FEDERAL HOME LOAN MORTGAGE CORPORATION, d/b/a Freddie Mac,

       Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:16-cv-00008-LO-IDD)

Argued: December 6, 2017                                Decided: April 23, 2018

Before GREGORY, Chief Judge, WILKINSON and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** William Spencer Consovoy, CONSOVOY MCCARTHY PARK PLLC, Arlington, Virginia, for Appellant. Michael Andrew Oakes, HUNTON & WILLIAMS, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Steve Sumner, David Schick, Justin Sumner, Gayle Boone, SUMNER SCHICK & PACE LLP, Dallas, Texas; Bryan K. Weir, CONSOVOY MCCARTHY PARK PLLC, Arlington, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Computer Sciences Corporation ("CSC") appeals the district court's order awarding partial summary judgment to Federal Home Loan Mortgage Corporation ("Freddie Mac") as to CSC's claims for breach of contract and breach of an implied covenant of good faith and fair dealing. We conclude that there are no genuine disputes of material fact with respect to CSC's claims. We therefore affirm the district court's judgment.

## I.

We construe the evidence in the light most favorable to CSC, the nonmoving party, and draw all inferences in its favor. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 150 (4th Cir. 2012) (citation omitted). CSC, an information technology services company, contracted with Freddie Mac in November 2014 to implement a multiphase network modernization of Freddie Mac's information technology services, including, among other services, the design, installation and management of a new telephone system.

The parties agreed that the first phase of work performed would focus on the transition of Freddie Mac's voice services to CSC. The Master Services Agreement ("MSA") and Work Order No. 1 ("WO#1") (collectively, the "Agreement") provided for a transition period during which CSC was required to achieve several project "Milestones," each consisting of tasks to be completed by a specified date. CSC reached a Milestone and received a "Milestone Payment" when it successfully implemented a

new layer of services for Freddie Mac. CSC could not invoice Freddie Mac until Freddie Mae agreed that the Milestone had been met, *see* WO#1, Schedule C, § 2.1(c), and Freddie Mac could not unreasonably withhold, delay, or condition its approval of a Milestone, *see* WO#1, Schedule A, § 4.1(g). Once approved, the Milestone Payments would "fully compensate" CSC for certain expenses, including "transition" costs. WO#1, Schedule C, § 2.1(a). The parties agreed Freddie Mac would not separately reimburse CSC for incidental expenses such as travel and lodging. MSA § 5.3.

After the transition period, the Agreement required CSC to provide services at a flat monthly rate, with adjustments based on equipment usage and whether CSC met required service levels. Section 6.1 of the MSA required CSC to invoice Freddie Mac for all amounts due under the Agreement each month "within thirty (30) days after the end of the month in which the Services were performed." MSA § 6.1(a). Where charges for a particular month could not be determined as of the invoice date, charges could be billed on a later invoice, "but not later than ninety (90) days after the end of the month in which incurred. If Freddie Mac has not received an invoice for Services within [90 days], Freddie Mac will have no obligation to pay for such Services." MSA § 6.1(d).

CSC agreed that it would not perform any services materially different from, and in addition to, the services then being provided without first obtaining a signed change order. Any such services performed without a change order would be "deemed to have been performed . . . at no additional charge." MSA § 3.12(b).

Pursuant to the contract's termination provisions, Freddie Mac could terminate the Agreement for cause in the event of, among other things, a "Critical Services Failure,"

3

including where "Data or Voice Services [are] down at any one Critical Location for longer than 60 minutes total in a 24-hour period." MSA § 20.2; WO#1, Exh. A-9, § 3.1. In the event of termination for cause, Freddie Mac would be required to pay CSC the "Balance Sheet Amounts," which would fully compensate CSC for costs incurred prior to termination. If Freddie Mac terminated for convenience, however, it had to pay, in addition to the Balance Sheet Amounts, "Early Termination Fees" and "Wind-Down Expenses." MSA § 20.4 & Attachment 9, § 1. Under the Agreement's savings clause, CSC's nonperformance of its obligations under the Agreement is excused if its nonperformance "directly results from Freddie Mac's failure to perform," so long as CSC gives "prompt, reasonable notice of such nonperformance" in writing.[1] MSA §§ 12.3, 23.4. The Agreement's force majeure clause provided that CSC could not be held liable for an "event beyond the reasonable control of a party" provided that it was "without fault in causing or failing to prevent" the event, and the event "could not have been avoided by reasonable precautions, . . . including by CSC carrying out its responsibilities under this Agreement with respect to disaster recovery and business continuity." MSA § 21.2(a).

The parties agree that the contractual relationship was problematic from the start. CSC contends that a network assessment revealed the true condition of Freddie Mac's existing infrastructure and as a result, the parties agreed that rather than performing a

---

[1] All formal notices under the Agreement were required to be in writing, and, if given to Freddie Mac, sent or otherwise delivered to the individuals specified in Section 23.4 of the MSA.

4

"refresh" of Freddie Mac's local area network ("LAN") over five years as stated in the Agreement, CSC would remediate ninety percent of the LAN by March 2015. According to CSC, it was never suggested that it would perform the work for free or that it would be considered part of the original Agreement. Freddie Mac accepted the accelerated LAN remediation, but when CSC requested a change order for the extra labor, Freddie Mac rejected it, first asserting that the costs were part of the original contract, and later that the services were "new" and thus required an approved change order.

Freddie Mac also experienced a series of service quality issues with the new telephone system, including dropped calls, one-way-only audio, delayed delivery of voicemails, distorted voice quality, nonfunctioning phones and speakerphones, and numerous outages. On April 1, 2015, Freddie Mac's traders experienced a phone service outage that prevented them from using their phones to make financial trades. From July 4 to July 6, 2015, Freddie Mac experienced a 44-hour voice system outage that left over 7,000 users without functioning telephones (the "July 4 outage").

CSC asserts that many of the flaws and problems that arose during and after the transition were due to Freddie Mac's own failures, including its failure to disclose that its existing equipment was "archaic" and required accelerated remediation. CSC also asserts that Freddie Mac failed to review and unreasonably withheld approval on change orders, refused to approve Milestones, put its employees in supervisory roles over CSC, and imposed "artificially tight deadlines," while delaying the provision of needed information or approvals to CSC. To the contrary, Freddie Mac alleges that CSC did not have the necessary experience or resources for the job, engaged in haphazard or nonexistent

5

planning and preparation, employed inadequate and unqualified personnel, and lacked a viable strategy to complete the project. It claims that these shortcomings forced its employees to fill in and perform tasks CSC should have performed, causing confusion and operational problems, and that CSC's employees lacked the skills, training and expertise to prevent or remedy the service issues.

Freddie Mac, citing both CSC's failure to provide contractually required services and the July 4 outage (which it deemed a "Critical Services Failure" under the terms of the Agreement), terminated the Agreement for cause on August 3, 2015.[2]

CSC submitted several invoices for payment beginning on September 1, 2015. When Freddie Mac refused to pay them, CSC sued Freddie Mac for breach of contract and breach of an implied covenant of good faith and fair dealing. Freddie Mac subsequently moved for partial summary judgment. Applying New York law[3] and citing the plain language of the Agreement and the undisputed facts, the district court granted Freddie Mac's motion on CSC's breach of contract claim, finding that Freddie Mac was

---

[2] The effective date of termination was later extended by agreement to December 3, 2016.

[3] Section 22.3 of the MSA provides that "all aspects of the parties' relationship" will be interpreted and construed according to New York law. Applying Virginia's choice of law rules, the district court honored the Agreement's choice of law provision and applied New York law to its analysis of the Agreement. J.A. 430; *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Hitachi Credit Amer. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (Virginia law looks favorably upon choice of law clauses in contracts, giving them full effect except in unusual circumstances).

not obligated to pay the disputed invoices.[4] The district court also granted Freddie Mac's motion as to CSC's claim for breach of the covenant of good faith and fair dealing because the claim was duplicative of the breach of contract claim, and CSC failed to present evidence showing Freddie Mac's breach of an independent duty of good faith. Thereafter, the parties jointly stipulated to the dismissal of certain remaining claims with prejudice, specifically preserved others for appeal, and agreed that CSC "expressly waive[d] its right to appeal any issue not expressly preserved" therein. CSC now appeals.

II.

This Court reviews a grant of summary judgment de novo. *Rosetta Stone Ltd.*, 676 F.3d at 150; *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is warranted "only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a). A dispute is "genuine" if the non-movant "present[s] evidence from which a [trier of fact] might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere speculation, however, by the non-moving party does not create a genuine issue of material fact. *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). Conclusory allegations, the building of one inference

---

[4] As discussed *infra*, the district court declined to grant Freddie Mac's summary judgment motion as to Invoices 2 through 4, thus only Invoices, 1, 25, 34 through 52, and the claims for transition costs, early termination fees and wind-down expenses are at issue in this appeal.

upon another, or the mere existence of a scintilla of evidence cannot defeat summary judgment. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

A.

We begin by first addressing CSC's breach of contract claim. At issue is Freddie Mac's refusal to pay several invoices submitted months after termination of the Agreement, including one for "Base Charges" for the month of April 2015 (Invoice 1), one for local area network ("LAN") remediation labor (Invoice 25), and nineteen for LAN remediation maintenance and support (Invoices 34-52), as well as claims for "Transition Costs," "Early Termination Fees," and "Wind-Down Expenses." For the reasons that follow, the district court's grant of partial summary judgment as to each portion of CSC's breach of contract claim was proper.

i.

As to Invoice 1, CSC requested payment for "Base Charges" for services CSC provided on a recurring basis for the month of April 2015. CSC was entitled to invoice Freddie Mac only after the Milestone related to the Base Charges had been approved, but in this instance, Freddie Mac never approved the Milestone corresponding to Invoices 1 through 4. CSC contends that it remained entitled to invoice for these fees because Freddie Mac unreasonably refused to approve the corresponding Milestone, or in the alternative, that Freddie Mac, through its actions, impliedly approved the Milestone. Indeed, the district court declined to grant Freddie Mac summary judgment as to Invoices 2 through 4, concluding that an issue of fact remained as to the approval of the Milestone.

But Freddie Mac refused to pay Invoice 1 not only because the Milestone had not been approved, but also because it was untimely. There is no factual dispute that Invoice 1 was submitted on September 1, 2015, and the district court interpreted Section 6.1(d) of the MSA to prohibit payment of any invoice submitted more than ninety days after the end of the month in which the fees were incurred. J.A. 433. A plain reading of Section 6 of the MSA leads us to the same conclusion.

Section 6.1(a) of the MSA provides that CSC "shall invoice Freddie Mac for all amounts due under the Agreement on a calendar monthly basis within thirty (30) days after the end of the month in which the Services were performed." While Section 6.1(d) creates an exception where some charges incapable of being determined as of the invoice date may be billed on a later invoice, the language of this section states unequivocally that Freddie Mac has "no obligation to pay" for any services invoiced beyond the ninety-day period. Thus the district court properly concluded that Freddie Mac was not obligated to pay Invoice 1 and is entitled to summary judgment as to this portion of CSC's breach of contract claim.[5]

The district court recognized the difficult position in which CSC found itself given that it was required by Section 6.1 to submit timely invoices for payment for services

---

[5] CSC contends that this Court must reverse the district court's decision to grant summary judgment as to Invoice 1 based on the application of Section 6.1(d) because Freddie Mac did not raise the argument and CSC did not have the opportunity to address the issue. We disagree. CSC had notice that Freddie Mac asserted the invoice was untimely and was given the opportunity to respond. *See Allstate Inc. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006); *Pension Ben. Guar. Corp. v. Mize Co., Inc.*, 987 F.2d 1059, 1061 (4th Cir. 1993). Moreover, there is no material dispute regarding the meaning of Section 6.1(d).

rendered, yet it was not authorized, pursuant to the terms of Schedule C, Section 2.1(c) of WO#1, to do so because Freddie Mac had not approved the Milestone. Yet nothing in the Agreement precluded CSC from submitting this or any other invoice for the purposes of dispute resolution, or simply for purposes of meeting the ninety-day deadline. As the district court noted, the parties agreed upon a method of resolving disputed charges. Section 6.7 of the MSA provides in part that Freddie Mac may withhold payment of charges that Freddie Mac disputes in good faith, shall pay any disputed charge determined to be properly payable within thirty days following such determination, and will use reasonable efforts to provide CSC with an explanation of the dispute on or before the original payment date. MSA § 6.7. CSC, however, failed to invoke this process which, by operation of its own terms, requires CSC to submit any disputed invoices to Freddie Mac for review and resolution prior to payment. Thus if CSC was aggrieved by Freddie Mac's failure to approve the applicable Milestone, CSC was not, as it asserted, precluded from timely submitting disputed invoices for review and consideration pursuant to Section 6.7.

ii.

Next, we turn to CSC's claims related to the LAN Remediation Invoices for labor (Invoice 25), installation and maintenance of equipment installed during its remediation (Invoices 34 through 49), and monthly maintenance charges (Invoices 50 through 52). CSC acknowledges that Freddie Mac did not approve the change order submitted after the work had been completed, but asserts that an alleged oral modification excuses CSC

from its obligation to secure a change order before performing extra work not specified in the Agreement. Both the facts and New York law belie that argument.

Under New York law, contractual provisions requiring that modifications to a contract be in writing are strictly enforced. *See John Street Leasehold LLC v. Fed. Deposit Ins. Co.*, 196 F.3d 379, 382 (2d Cir. 1999). It does not permit oral modification when the original agreement provides that modifications be signed and in writing. Section 23.9 of the MSA, its change order provision, includes such a requirement. Thus even if the alleged discussions and meetings regarding the performance of additional work took place, they cannot operate as an oral modification of the Agreement's scope of work or the requirements of its change order provision.

Freddie Mac, in refusing to pay Invoices 25 and 34 through 52, did nothing more than abide by the express contract term requiring written change orders, which cannot constitute bad faith. *Aetna Cas. & Surety Co. v. Namrod Dev. Corp.*, 140 B.R. 56, 63 (S.D.N.Y. 1992). Freddie Mac was not obligated to execute a change order after the fact or to pay more for the work, as any extra work performed without being authorized by a change order is deemed to have been performed at no additional charge.[6]

### iii.

We turn next to the portion of CSC's breach of contract claim for failure to pay transition costs. CSC concedes on appeal that the Agreement does not allow separate

---

[6] Summary judgment was also appropriate as to Invoices 34 through 48 because Section 6.1(a) of the MSA requires the submission of invoices within thirty days after the end of the month in which services were provided. These invoices were submitted to Freddie Mae on July 5, 2016, for services provided in April 2015 through May 2016.

recovery for incidental expenses such as travel and lodging. *See* MSA § 5.3. But CSC argues that the district court failed to recognize that its claim for transition costs also included charges for labor, maintenance and support incurred on Freddie Mac's behalf. CSC acknowledges that the Agreement expressly provides for payment of transition costs only through Milestone Payments and prohibits CSC from billing for them in any other manner unless Freddie Mac agrees in advance. CSC argues now, for the first time on appeal, that there is a genuine issue of fact as to whether Freddie Mac unreasonably denied approval of the Milestones, thus excusing CSC from its duty to obtain Freddie Mac's approval to invoice the transition costs.[7]

Because this argument was not raised in the district court, CSC cannot raise it here. *See Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, 1068 (4th Cir. 1993). Even if this Court were to consider this argument, it would fail because there is simply no contractual basis for CSC's recovery of transition costs in the manner it now seeks to recover them. The language of the Agreement is unequivocal—payments for transition costs are reimbursable entirely through Milestone Payments. CSC has not presented facts demonstrating how the transition costs claimed are related either to the Milestones it met or to those for which it claims approval was unreasonably withheld. Moreover, the joint stipulation executed by the parties after the entry of the district

---

[7] CSC contends that Freddie Mac acted unreasonably by deploying and using its services, but later claiming they were unacceptable when the time came to approve the Milestone, by adding acceptance criteria that did not exist, or by giving approval, but then revoking it.

court's summary judgment order states that CSC's claims against Freddie Mac related to Milestone Payments have been satisfied.[8]

iv.

Finally, the district court properly granted summary judgment as to CSC's claims for early termination fees and wind-down expenses. The Agreement requires Freddie Mac's payment of these fees and expenses when Freddie Mac terminates for convenience, not for cause. The uncontroverted evidence is that Freddie Mac terminated the Agreement for cause following the July 4 outage. Although the outage meets the contractual definition of a Critical Service Failure in that it impacted a Critical Location and lasted more than sixty minutes in a 24-hour period, CSC contends that Freddie Mac's for-cause termination of the Agreement was not justified because Freddie Mac's misconfiguration of its domain name system (DNS) server prevented communications from "failing over" to an alternate data center. CSC then concludes that pursuant to the MSA's savings clause, Freddie Mac's failure to properly configure the server excuses its nonperformance of its obligations. We cannot agree.

CSC's only support for its contention that Freddie Mac misconfigured the DNS server lies in the proffered opinion of its expert, Stuart Harris. The district court properly excluded Harris' report, which CSC has conceded was untimely, and CSC has failed to preserve any objection to the court's exclusion of the report for appeal. But even taking

---

[8] The parties stipulated that they "reached an agreement resolving each of the three remaining claims," including [w]ith respect to CSC's breach of contract claim, whether CSC was entitled to recover Milestone payments for transition milestones . . . " and "stipulate to the dismissal, with prejudice of each of these claims." J.A. 453.

13

Harris' conclusion regarding the misconfiguration of the DNS server as true, his statements do not create a genuine dispute of material fact regarding responsibility for the July 4 outage. CSC's own employees acknowledged that "the service [CSC] implemented did not have a working failover/DR solution," J.A. 1895, "there were no redundant circuits" at the impacted data centers as required by the contract, J.A. 1890-91, and that the outage occurred due to the absence of a contractually-required secondary circuit that would have acted as a backup if the first one failed. J.A. 1902-04. CSC's Executive Vice President took full responsibility for the outage that occurred as a result.

Moreover, CSC is not excused from its responsibility for the July 4 outage under the Agreement's savings clause. The savings clause requires "prompt, reasonable notice of nonperformance" in writing. MSA §§ 12.3, 23.4. Yet CSC alleges that it provided oral notice regarding Freddie Mac's misconfiguration of the DNS server at a September 3, 2015 meeting; two months after the Critical Service Failure, and one month after termination of the Agreement for cause. Similarly, CSC's new alternative argument that the MSA's force majeure provision applies fails because CSC did not raise it below, the July 4 outage does not meet the MSA's definition of a force majeure event, and CSC did not give Freddie Mac any notice, written or otherwise, of its invocation of the force majeure provision.

B.

Next, CSC alleges that Freddie Mac breached an implied covenant of good faith and fair dealing. Freddie Mac moved for summary judgment, and the district court

determined that the claim is duplicative of its breach of contract claim and that CSC has failed to state facts in support of its claim that Freddie Mac acted in bad faith. We agree.

"Under New York law, there is a covenant of good faith and fair dealing implied in all contracts." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp.2d 290, 298 (S.D.N.Y 2012). A breach of that duty is treated as a breach of the underlying contract and therefore duplicative of a breach of contract claim unless it is "premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Secs., Inc. v. Rhodes*, 578 F. Supp.2d 652, 664 (S.D.N.Y. 2008). *See Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). "For a complaint to state a cause of action of alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128, 130 (1999). Absent additional, actionable allegations, the only question is whether Freddie Mac breached the contract. *See Deutsche Bank Secs.*, 578 F. Supp.2d 652, 664 (S.D.N.Y. 2008).

In this case, CSC has failed to set forth additional factual allegations to demonstrate a breach of an independent duty of good faith and fair dealing, apart from the breach of contract. Its implied covenant claim is not only duplicative of its breach of contract claim, but also based on conclusory allegations of bad faith.

Freddie Mac relies on CSC's nearly-identical interrogatory responses to support its view that the factual bases for CSC's two claims are the same. Interrogatory 6 asks CSC

to explain the factual basis for its contention that Freddie Mac's conduct in performing, or failing to perform, under the Agreement was the "product of gross negligence, willful misconduct, or fraud." J.A. 1947. Interrogatory 13 asks CSC to explain the factual basis for its contention that Freddie Mac breached the duty of good faith and fair dealing, including any support for the allegation that Freddie Mac acted in a manner that prevented CSC from providing the "full measure of services . . . or that there would be additional Work Orders beyond Work Order #1." J.A. 1952. The responses differ materially only in that the response to Interrogatory 13 goes on to include the conclusory statement that "[t]his conduct, and others, prevented CSC from providing the full measure of services contemplated by the MSA," and that "the parties contemplated there would be additional Work Orders beyond Work Order #1 to provide for enhanced services related to voice services, including the implementation of an enhanced 'e-911' service." J.A. 1947-50, 1952-55. Moreover, there is no evidence of bad faith in the record to support the allegations of the claim. Accordingly, the district court properly found that the actions CSC alleged were not evidence of bad faith and unfair dealing in fact fell within the rights, responsibilities and procedures set forth in the Agreement.

CSC claims that Freddie Mac "rejected change orders arbitrarily and in bad faith" and sabotaged its performance by refusing to relinquish control over its systems, putting its ill-trained employees in positions of authority over CSC, and establishing "artificially tight deadlines," while "dragg[ing] its heels" in providing information or approvals, thus requiring CSC to expend more time, resources, and manpower, which ultimately undermined the contractual relationship and led Freddie Mac to terminate the Agreement.

But many of the actions of Freddie Mac that CSC complains of are directly addressed in, and resolved by, specific contract provisions. Complying, and demanding that CSC comply, with the express terms of the Agreement is not evidence of bad faith.

Contrary to CSC's repeated references to Freddie Mac's arbitrary rejection of change orders, there was only one change order, for the LAN remediation, that Freddie Mac did not execute. The entire change order process, including when and under what circumstances they are to be obtained, and the consequence for failing to do so, is fully addressed by the Agreement. Freddie Mac had no contractual obligation to pay for work for which there was no valid change order. CSC's allegation regarding Freddie Mac's refusal to sign a change order is just a duplication of its breach of contract claim made on the same grounds. Furthermore, there is no evidence to support CSC's claim that Freddie Mac acted in bad faith in refusing to execute a change order submitted after the work had already been completed.

CSC next complains that Freddie Mac "refused to relinquish control over its systems" and put its own ill-trained employees "in positions of authority over CSC." This issue is also addressed directly in the Agreement, which contemplates that Freddie Mac would maintain control of the project. CSC's contractual performance was "subject to the overall direction of Freddie Mac and with the cooperation and support of Freddie Mac as specified in this Agreement." MSA § 8.1. Moreover, "[t]he right and responsibility for establishing the information technology architecture, standards and strategic direction of Freddie Mac [would] at all times remain with Freddie Mac." MSA § 11.3(a). There is no evidence that Freddie Mac's actions, although perhaps frustrating

17

to CSC, were taken in bad faith to thwart performance of the Agreement. Thus CSC's complaints about staffing and chain of command merely duplicate its breach of contract claim.

Similarly, no evidence supports CSC's conclusory allegation that Freddie Mac, by creating tight deadlines and delaying or denying approvals, purposely frustrated CSC's performance of the Agreement, or engaged in a scheme to avoid payment and to terminate the Agreement for cause after receiving the benefit of CSC's assets and services. As evidence of such a scheme, CSC points to two email chains between Freddie Mac employees which it claims demonstrate Freddie Mac's bad faith intent. First, CSC selectively cites to a May 20, 2015 email chain from Freddie Mac's Chief Information Officer (CIO) to his colleague, wherein the CIO purportedly states that his "obvious choice is to pay [CSC] nothing for implementation . . ." and asks for a determination of Freddie Mac's legal rights and whether they would support his position. J.A. 2379. The email correspondence goes on to state that the CIO's preference is that Freddie Mac withhold payment "till [sic] they fix our issues." *Id*. In the same email chain, the CIO makes it clear that "[m]y desire is to dispute the payment in that I don't think CSC provided a reasonable level of services in terms of the implementation or ongoing service." *Id*. Thus contrary to CSC's assertion that Freddie Mac was motivated by bad faith, the email demonstrates Freddie Mac had reached the conclusion that CSC's performance was inadequate and that it wanted CSC to provide Freddie Mac the level of service for which it had contracted. Similarly, the June 30, 2015 email stating that Freddie Mac had not paid for voice services and CSC could not "backbill" for the

services was a mere recitation of fact and of the contract terms as they pertained to concerns regarding CSC's performance. At best, it is evidence only that Freddie Mac was exploring its options to terminate the Agreement, as was its right. Nothing in either email chain suggests that Freddie Mac intended to manufacture an excuse to terminate the Agreement; rather the emails demonstrate that Freddie Mac had valid reasons to consider termination, even before the July 4 outage. Given the subsequent Critical Service Failure, Freddie Mac was well within its contractual rights to terminate for cause.[9]

III.

For these reasons, we affirm the district court's award of partial summary judgment to Freddie Mac.

*AFFIRMED*

---

[9] To support its claim that Freddie Mac terminated the Agreement for cause in bad faith, CSC attempts to downplay the seriousness of the incident, stating that Freddie Mac was "not affected" by the July 4 outage because it occurred over a holiday weekend, and that Freddie Mac used the outage as an excuse to terminate the Agreement and enjoy the benefits of CSC's services without paying for them. Yet the definition of a Critical Service Failure does not exclude such incidents that occur on a weekend. The incident, regardless of when it occurred, falls squarely within the Agreement's definition.